UNITED STATES of America, Appellee,

v.

Russell Terry WILLIAMS, Appellant.

No. 92–1360.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 12, 1992.

Decided May 25, 1993.

Rehearing Denied July 15, 1993.

James Ralph Hobbs, Kansas City, MO, argued (James R. Hobbs and Marilyn B. Keller on the brief) for appellant.

John Foster Appelquist, Springfield, MO, argued (Jean Paul Bradshaw, II and John F. Appelquist on the brief) for appellee.

Before RICHARD S. ARNOLD, Chief Judge, FLOYD R. GIBSON, Senior Circuit Judge, and ROSENBAUM,* District Judge.

RICHARD S. ARNOLD, Chief Judge.

Russell Terry Williams appeals his conviction and sentence for distributing cocaine. He argues that evidence of his presence during a later drug deal was inadmissible, and that his counsel was ineffective in failing to listen to tapes of the drug transaction before trial. Williams also argues that his sentence was improper, claiming that he did not negotiate to sell some cocaine that was counted in his base offense level, and that the District Court[1] miscalculated his criminal history. We affirm.

I.

On February 22, 1990, an undercover police officer, Jack McMillan, accompanied by a confidential informant wearing a hidden tape recorder, visited Patricia Melton to investigate drug dealing at her home. Trial Transcript (Tr.) 43–44, 54; Appendix (App.) 1. They discussed with Melton plans to go with her to buy drugs elsewhere. Tr. 49–50; App. 22. Instead, Williams arrived. Tr. 51–52; App. 23. The informant said that she did not want to go out, and Melton then said it was unnecessary to do so because Williams was going to take care of some business for her. Tr. 54; App. 23–24. After discussing a possible future sale of a quarter-pound of cocaine, Williams left. App. 25–31.

Williams returned about 30 minutes later and said that the drug source could bring them drugs in no sooner than an hour and a half. McMillan refused to wait. Tr. 55–56, 171; App. 61. Williams then sold to McMillan an "eight-ball," which is approximately 3.5 grams of cocaine, for $250. Tr. 56; App. 62–64. The confidential informant recorded this entire transaction, Tr. 54, and Williams later was indicted for distribution of cocaine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C).

The transcript of the recorded drug sale varied from the recording in at least three

---

* The Hon. James M. Rosenbaum, United States District Judge for the District of Minnesota, sitting by designation.

1. The Hon. Dean Whipple, United States District Judge for the Western District of Missouri.

places. Tr. 77–80, 120.[2] The most significant of these variances quoted Melton as offering to sell McMillan an eight-ball of cocaine. Tr. 79–80; App. 63. In the recording, as McMillan testified, Williams, not Melton, made this offer. Tr. 80; see also Sentencing Transcript (S.T.) 40. At trial, Williams's attorney relied primarily on the transcript, having never listened to the whole recording. S.T. 40; Tr. 159. During his opening statement, he challenged the jurors to listen carefully to the tape, which he promised would reveal that Melton, not Williams, had conducted the drug sale. Tr. 26–27.

Also at trial, McMillan testified that Williams was present during another drug deal, which occurred on February 26, 1990, four days after Williams's drug sale at Melton's home. Tr. 80–82. McMillan did not say that Williams participated in this transaction, and Williams was not indicted for it. At the close of trial, the jury found Williams guilty of the February 22 drug-distribution count.

At Williams's sentencing, the government argued that Williams had negotiated with McMillan for the sale of a quarter-pound of cocaine before Williams left the residence. S.T. 17–18; see also Tr. 102. The District Court used this evidence to increase Williams's base offense level from 12 to 18, effectively doubling the applicable sentencing range. The Court assessed Williams 12 points for four earlier convictions, corresponding to a criminal history category of V. The District Court sentenced Williams to 63 months' imprisonment, five years' supervised release, a fine of $6,000, and a special assessment of $50.

## II.

■ Williams first argues that the District Court erred in admitting Officer McMillan's testimony that Williams was present during the drug deal that occurred on February 26, 1990, four days after the transaction at Melton's home. McMillan testified that he was trying to buy drugs from some people on February 26 when "Terry Williams showed up." Tr. 81. Williams insists that this evidence was relevant only to showing that he had a propensity to commit drug crimes, that it was unduly prejudicial to him, and, therefore, that it was admitted in violation of Federal Rule of Evidence 404(b).[3]

■ We review the admission of Rule 404(b) evidence for abuse of discretion. *United States v. Mays*, 822 F.2d 793, 797 (8th Cir.1987). Although Rule 404(b) restricts admission of evidence of similar crimes or acts, it permits admission of such evidence when the evidence is relevant to proving identity, among other things. The government contends that McMillan's testimony about Williams's presence during the February 26 drug deal was relevant to establishing Williams's identity. Although it would have been better had the government said this at trial, we agree that the testimony was relevant to identifying Williams. See Tr. 81.

Williams argues that his identity was not contested, and thus that this part of McMillan's testimony is not relevant to a material issue and should not have been admitted. However, we have said that "[e]vidence of repeated meetings between the defendant and the government witness is substantially probative in that it indicates a greater likelihood of accurate identification." *McClendon v. United States*, 587 F.2d 384, 386 (8th Cir.1978), *cert. denied*, 440 U.S. 983, 99 S.Ct. 1793, 60 L.Ed.2d 244 (1979). Here, McMillan's testimony was relevant to enhancing the credibility of his in-court identification by

---

**2.** The tapes were admitted into evidence and played in court, and the jury was permitted to read the transcript. The Court told the jury that it should rely on the tape rather than the transcript when the two conflicted. Tr. 160–61.

**3.** The government claims that we need not review the admission of this evidence because the record is ambiguous as to whether the evidence

was ever admitted. Tr. 82. To support this view, the government quotes a discussion of proposed jury instructions at the end of trial, in which Williams's attorney withdrew his request for a limiting instruction because the "Government never did present their[ ]" evidence of similar acts. Tr. 184–85. But the record indicates that the jury heard McMillan's testimony. For this reason, we treat this testimony as having been admitted.

showing that he had met Williams more than once.

■ When evidence is relevant to identity or other material issues under Rule 404(b), its probative value still must be balanced against its prejudicial effect under Federal Rule of Evidence 403. *Mays*, 822 F.2d at 797 (citation omitted). Williams argues that even if this evidence is relevant, it is unduly prejudicial because it implies his familiarity with a drug-dealing network. The testimony bolstered the credibility of McMillan's identification of Williams, however, and we cannot say that this probative value was outweighed by the evidence's prejudicial effect. The testimony did not implicate Williams in the February 26 drug deal. It did no more than establish that he was present at the time.

■ Williams also challenges the admission of this same testimony because the Court gave no instruction limiting the jury's use of it to identity. Generally, "the court should give a limiting instruction informing the jury of the narrow purpose for which [404(b) evidence] ... was admitted." *United States v. Miller*, 725 F.2d 462, 466 (8th Cir. 1984). While such an instruction would have "diminishe[d] the danger of any unfair prejudice arising from the admission of other acts," *Mays*, 822 F.2d at 797, Williams withdrew his request for it. The omission of this instruction here is not plain error requiring reversal. See *United States v. Milham*, 590 F.2d 717, 722 (8th Cir.1979); *United States v. Conley*, 523 F.2d 650, 654 n. 6 (8th Cir.1975), *cert. denied*, 424 U.S. 920, 96 S.Ct. 1125, 47 L.Ed.2d 327 (1976).

Citing *United States v. Yeo*, 739 F.2d 385 (8th Cir.1984), Williams further argues that admission of this evidence constituted a constructive amendment of or substantial variance from the indictment, causing him to be tried for an uncharged crime. We disagree. In *Yeo*, as here, the government introduced evidence of illegal acts of the defendant that were not included in the indictment. However, in *Yeo*, the jury instructions permitted the jury to find the defendant guilty of the uncharged conduct. *Id.* at 386. Unlike Yeo, Williams has pointed to nothing in the jury instructions in his case that constructively amended the indictment; the instructions would not have allowed the jury to convict him for the February 26 drug deal instead of the one charged. See also *Stirone v. United States*, 361 U.S. 212, 219, 80 S.Ct. 270, 274, 4 L.Ed.2d 252 (1960) ("Yet because of the court's admission of evidence and under its [jury] charge [the uncharged conduct] might have been the basis upon which the trial jury convicted petitioner."). The evidence admitted likewise did not cause the proof at trial to vary from the indictment; here, the "indictment fully and fairly apprised the defendant of the charges he ... must meet at trial." *United States v. Begnaud*, 783 F.2d 144, 148 (8th Cir.1986).

## III.

■ Williams next argues that his counsel was ineffective because he did not prepare adequately. His attorney, Williams says, should not have relied on the transcript of the tape recording of the February 22 drug deal. Rather, he should have listened to the recording. Presumably, had he done so, he would not have promised the jurors that the tapes would prove that Melton, rather than Williams, offered to sell the eight-ball.[4] The attorney, in essence, might have devised a different theory of the defense, other than a general denial premised on blaming Melton.

■ We normally do not hear claims of ineffective assistance of counsel that are raised on direct appeal; rather, such claims should be presented to a district court under 28 U.S.C. § 2255. *United States v. Thompson*, 972 F.2d 201, 204 (8th Cir.1992) (citation omitted). The purpose of this rule is to enable the parties to develop facts outside the original record about the quality of rep-

---

4. In his opening statement, Williams's attorney said

Now, the federal prosecutor stood in front of you a while ago and said that a transaction occurred, and that my client said "$250, that's

good," and there was a transaction. The tapes do not say that. I challenge you. I challenge him. And I challenge the trooper to listen to those tapes.
Tr. 26–27.

resentation. *United States v. Dubray,* 727 F.2d 771, 772 (8th Cir.1984) (per curiam) (citation omitted). In this case, however, Williams has already presented the factual basis for his ineffective-assistance claim, S.T. 38–39, and his attorney has responded. Accordingly, we turn to the merits of Williams's ineffective-assistance-of-counsel claim.

Williams's attorney first summarized Williams's argument that the "transcript portrayed certain statements by another person when, in fact, the actual tape itself indicated that that statement was made by my client." S.T. 40. He then explained that Williams had taken the file three. weeks before trial and had returned it only three days before trial, after the attorney had received help in locating his client. *Id.* The attorney then said that he "went through the transcript, and then I sent John Kelly, the attorney who works for me, over to review the transcript. He listened to the tape. I listened to portions of the tape. Neither one of us picked up the errors." *Id.* After hearing these arguments, the District Court found that Williams's attorney had properly represented him. *Id.* at 41.

To prove ineffective assistance of counsel, Williams must show that his attorney's conduct was unreasonably unprofessional and, as a result, caused actual prejudice to Williams. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Dawan v. Lockhart,* 980 F.2d 470, 473 (8th Cir.1992). We need not address the reasonableness of the attorney's behavior because it did not prejudice Williams. Even if his attorney had listened to the tapes and had not challenged the jury, and regardless of his defense strategy, the tape of the drug deal still would have been admitted into evidence and shown that the defendant, not Melton, offered the eight-ball for sale. In addition, we agree with the District Court that Williams's "complaint about the inaccuracy of the transcript is resolved by the instruction

that was given to the jury that if there was any conflict between the written transcript and the verbal wordage that came out on the tape, they were to rely on the tape." S.T. 41; see also Tr. 161. We cannot say that "there is a reasonable probability that, but for counsel's ... errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068.

Williams also argues that he was prejudiced because defense counsel focused his opening statement on blaming Melton for the drug sale "[r]ather than trying to create reasonable doubt in other areas of the case and requiring the government to prove its case." Defendant's Reply Brief 12. This is not persuasive. First, the jury apparently was given the standard instruction that attorneys' arguments are not evidence. Tr. 185; Government Brief 9. Second, defense counsel could have sought to raise a reasonable doubt in other areas of the case and to require the government to prove the elements of the crime without contradicting the defense theory of general denial. In any case, we cannot say that there is a reasonable probability that the outcome of the trial would have been different had he done so. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. Thus, we reject Williams's claim that he suffered prejudice caused by the inadequate preparation and strategy of his trial counsel.[5]

## IV.

Williams next claims that the District Court erred in assessing his base offense level at 18. He argues that the Sentencing Guideline provisions permitting consideration of negotiated but undelivered drugs in base-offense-level calculations do not apply here. He also claims that the alleged negotiation is not relevant offense conduct because it was not part of the same course of conduct, scheme, or plan as the sale of the 3.5 grams. Finally, he also asks us to exclude from the

---

**5.** We also reject Williams's argument that his attorney's ineffectiveness violated his Fifth Amendment right to due process. We have said that an identical argument invoking the Four-

teenth Amendment's Due Process Clause was "the same [ineffectiveness-of-counsel] argument in a different form." *Dawan,* 980 F.2d at 473 n. 2.

calculation of his base offense level his alleged negotiation of the sale of a quarter-pound of cocaine, the actual sale of which did not occur. Williams insists that the negotiation likewise did not take place.

### A.

■ Section 2D1.1 of the Sentencing Guidelines concerns the calculation of base offense levels for drug offenses, and Application Note 12 of that Section provides that "[t]ypes and quantities of drugs not specified in the count of conviction may be considered in determining the offense level."[6] This Application Note refers to Application Note 1 of § 2D1.4 when "the offense involved negotiation to traffic in a controlled substance. . . ." Application Note 1 provides that "[i]f the defendant is convicted of an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount."[7]

Williams argues that § 2D1.4's Application Note 1 is inapplicable in this case. He notes that § 2D1.4 is entitled "Attempts and Conspiracies" and pertains to base offense levels for defendants "convicted of conspiracy or an attempt to commit any offense involving a controlled substance. . . ." Williams argues that because his offense of conviction was neither an attempt nor a conspiracy, § 2D1.4 and its Application Note do not apply to him. We disagree.

By its language, § 2D1.4's Application Note 1 applies whenever the defendant was convicted of "an offense involving negotiation to traffic in a controlled substance." Application Note 12 of § 2D1.1 reinforces this reading. It allows a district court to consider other drugs for which the defendant was not charged, it directs that § 2D1.4 applies if the conduct involved negotiation, and it is not limited to attempts and conspiracies.[8] Other circuits and dictum from this Court support this reading of these provisions. *United States v. Foley*, 906 F.2d 1261, 1264 (8th Cir.1990) (dictum); *United States v. Davern*, 970 F.2d 1490, 1493 (6th Cir.1992) (en banc), *cert. denied*, —— U.S. ——, 113 S.Ct. 1289, 122 L.Ed.2d 681 (1993); *United States v. Garcia*, 889 F.2d 1454, 1457 (5th Cir.1989), *cert. denied*, 494 U.S. 1088, 110 S.Ct. 1829, 108 L.Ed.2d 958 (1990). Thus, the District Court may sentence Williams for the total amount of cocaine that he negotiated to sell, even though the offense of conviction was neither conspiracy nor attempt.

Williams also argues that any alleged negotiation to sell McMillan a quarter-pound of cocaine was not part of the same course of conduct as the sale of the 3.5 grams that was the offense of conviction. Application Note 12 to § 2D1.1 cites § 1B1.3(a)(2) when stating that the District Court may consider amounts of drugs not specified in the count of conviction in setting the offense level. Section 1B1.3(a)(2), pertaining to relevant offense conduct, permits inclusion in the calculation of base offense level acts and omissions that were part of the same "course of conduct, scheme, or plan as the offense of conviction." Williams claims that the sale of the 3.5 grams was an afterthought to any negotiations that may have taken place between Williams or Melton and McMillan. The District Court's implicit finding that the alleged negotiation for one quarter-pound was part of the same course of conduct as the actual sale of the eight-ball is not clearly erroneous. The negotiation and the sale involved similar conduct which occurred at almost the same

---

**6.** The District Court applied the 1991 version of the Sentencing Guidelines, which were those in effect at the time of the sentencing. 18 U.S.C. § 3553(a)(4); *United States v. Swanger*, 919 F.2d 94 (8th Cir.1990) (per curiam). All references here are to the 1991 version of the Guidelines, except where otherwise specifically noted.

**7.** Section 2D1.4 was deleted in the November 1992 revision of the Guidelines. However, at the

same time, the language of § 2D1.4's Application Note 1 was merged into Application Note 12 of § 2D1.1.

**8.** That the contents of Application Note 1 later were merged into Application Note 12 of § 2D1.1, which is not limited to "attempts and conspiracies," further supports this argument.

time. *United States v. Lawrence*, 915 F.2d 402, 408 (8th Cir.1990).

### B.

Williams insists that there was insufficient evidence at trial to prove that he negotiated to sell the quarter-pound of cocaine. The government had the burden of proving by a preponderance of the evidence that Williams did so. *United States v. Simmons*, 964 F.2d 763, 771 (8th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 632, 121 L.Ed.2d 563 (1992). The finding of drug quantity is a finding of fact to be made by the District Court, and we will reverse such findings only if we see clear error. *Id.* at 773. Reversal is appropriate only if the entire record leaves us with the definite and firm conviction that a mistake has been made. *Id.* (citation omitted).

The District Court relied on the tape recording of the drug sale for its finding that Williams had negotiated to sell a quarter-pound of cocaine. S.T. 34–35. The Court specifically mentioned Williams's statements that he needed money and that he could get McMillan a quarter-pound for $4,800 that day. S.T. 34.

This discussion of the quarter-pound of cocaine arose when McMillan said "[i]t's cheaper by the quarter-pound." App. 25. When McMillan asked how much a quarter-pound cost, Williams told him $4,800, and the informant then told Williams that she and McMillan could not afford to buy that much that day. *Id.* at 26–27. McMillan suggested that the informant and Williams could "negotiate" that weekend. *Id.* at 29. Williams then said "[b]ut forty-eight right away, you can do that, I know, today." *Id.* The informant asked Williams, "[w]ell, if we decided to do this, [Melton] ... naturally knows how to get in touch with you and everything?" *Id.* Shortly thereafter, Williams left. *Id.* at 31.

Williams argues that this discussion shows only that the agent inquired about the price of a quarter-pound of cocaine, and that Williams merely answered the question. This, he says, is not the same as negotiating a sale.

The government argues that when Williams ran the errand for Melton, he already had agreed to obtain a quarter-pound of cocaine, not merely the ounce quantities that Melton and McMillan were planning to purchase before Williams arrived. See App. 4–5, 22–23. However, Melton announced that Williams was leaving to do "a little bit of business" for her well before McMillan ever asked about the price of a quarter-pound. App. 23–24.[9]

Williams likens his case to *United States v. Foley*, 906 F.2d 1261, 1264 (8th Cir.1990). Foley was convicted of selling cocaine, but we reversed the District Court's finding that Foley had negotiated to sell two more ounces of cocaine. In *Foley*, as here, it was the agent who inquired about the price of the additional cocaine. *Id.* We said that had Foley offered to sell the additional two ounces, we might have concluded "that she had begun negotiating for another sale and that amount could be considered to determine" her base offense level. *Id.* Recognizing that Foley was able to produce the additional amount, we said "had the two *agreed* to another sale of cocaine, any amount under negotiation for such a sale could be used in calculating" the base offense level. *Id.* at 1265 (emphasis in original).

Once the agent asked about the price of a quarter-pound, Williams did offer to try to obtain and sell him this amount. We think this is clearly sufficient to show that the additional quantity was "under negotiation," which is all that the Application Note at issue requires. It does not require a completed

9. Specifically, Melton told McMillan and the informant that they needed to accompany her "up the hill" to get the drugs that they had come to buy. App. 22. Before they left, though, Williams arrived. App. 23; Tr. 51–52. When the informant said that she did not want to go out, Melton said that they need not do so because Williams was leaving to "take care of a little bit of business for me." Tr. 54; App. 23–24. McMillan understood this to mean that Williams was going to bring a dealer to Melton's home so that McMillan could buy cocaine. Tr. 110. Only after this was arranged did McMillan first ask about the price of a quarter-pound of the drug. App. 25–26.

sale or an agreement to sell. *Foley*, 906 F.2d at 1265, refers in dictum to the necessity of an agreement, but it also indicates that only an offer to sell is required, *id.* at 1264, and the text of the Application Note—"under negotiation"—plainly requires only discussion, not an agreement or a completed transaction.

Finally, Williams argues that, even if a negotiation took place, the evidence did not establish his intent and capability to produce that amount of cocaine in accordance with § 2D1.4, Application Note 1. That provision provides that

> where the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing.

We agree with the District Court that Williams had the intent and capacity to produce this amount of cocaine, if an agreement had been made. S.T. 34–35. Williams told McMillan that he could get him a quarter-pound for $4,800 that day. App. 29. The District Court also found that evidence of prior drug involvement substantiated Williams's ability to produce drugs, S.T. 36, and that his need to make money was probative of his intent to do so. *Id.* at 34. These findings are not clearly erroneous.

## V.

 At sentencing, the District Court found that Williams had a criminal-history score of 12 points, placing him in category V. S.T. 35. According to Williams, this calculation is incorrect because two of the four crimes included in it were "related" crimes under § 4A1.2(a)(2) of the Sentencing Guidelines and should have counted as one rather than two prior crimes. This would have decreased both his criminal-history score and his sentence.

The government argues that Williams did not preserve this objection for appeal as re-

quired by Rule 51 of the Federal Rules of Criminal Procedure, and we agree. "Preserving an issue is a matter of making a timely objection to the trial court and clearly stating the grounds for the objection, so that the trial court has an opportunity to prevent or correct the error in the first instance." *United States v. Thornberg*, 844 F.2d 573, 575 (8th Cir.), *cert. denied*, 487 U.S. 1240, 108 S.Ct. 2913, 101 L.Ed.2d 944 (1988). We "will not reverse a district court on an issue that is raised for the first time on appeal unless a gross miscarriage of justice would otherwise result." *United States v. Filker*, 972 F.2d 240, 242 (8th Cir.1992) (citations omitted).

Williams argues that he preserved this argument for appeal when, at sentencing, his attorney said:

> Now, one of the issues addressed by the probation officer and, in addition, by the government in their motion for an upward departure, is that the criminal history section does not accurately reflect the criminal involvement of my client. I would like to remind the Court, both in the jury trial and in the report provided by the presentence investigating officer, the criminal history of my client all relates to a period prior to 1980.

S.T. 14–15. Although his attorney mentioned the criminal-history calculation, he did not raise the argument that Williams now urges on appeal. The attorney referred to the criminal-history calculation in opposing an enhancement of the sentence under § 4A1.3, not in arguing for a decrease of the sentence under § 4A1.2. Williams thus did not preserve for appeal the argument that his criminal history should be recalculated because two of the offenses were related. *Filker*, 972 F.2d at 242.

## VI.

We affirm the conviction, denying both Williams's evidentiary and ineffective-assistance-of-counsel claims. As to sentencing him for the negotiation of the quarter-pound of cocaine, we affirm, and because his objection to the calculation of the criminal history

was not raised below, we do not address this issue here.

Affirmed.